Ryan J. Ellersick (AZ #038805)
**ZIMMERMAN REED LLP**
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Fax: (480) 348-6415
ryan.ellersick@zimmreed.com

**JENNINGS & EARLEY PLLC**
Christopher D. Jennings*
Tyler B. Ewigleben*
Winston S. Hudson*
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
Telephone: (601) 270-0197
chris@jefirm.com
tyler@jefirm.com
winston@jefirm.com

** Pro Hac Vice application to be submitted*
*Counsel for Plaintiffs and the Classes*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Monte Connors, Dominique Dean, Melissa Millsaps, and Raja Bellani, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>True Blue Car Wash LLC, a Delaware limited liability company, d/b/a Rainstorm Car Wash and Clean Freak Car Wash,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

1. Plaintiffs Monte Connors, Dominique Dean, Melissa Millsaps, and Raja Bellani ("Plaintiffs"), individually and on behalf of all others similarly situated, by counsel, bring this action against Defendant True Blue Car Wash, LLC, a Delaware limited liability

company, d/b/a Rainstorm Car Wash and Clean Freak Car Wash ("Defendant" or "True Blue") for engaging in an illegal "automatic renewal" scheme with respect to its membership plans and in doing so, violating the (1) Illinois Automatic Contract Renewal Act ("IACRA"); (2) the Illinois Fraud and Deceptive Business Practices Act ("ICFA"); (3) the Indiana Deceptive Consumer Sales Act ("DCSA"); (4) the Texas Deceptive Trade Practices Act ("TDTPA"); and (5) unjustly enriching itself at the expense of Plaintiffs and the Classes.

2. Defendant is a car wash operator that owns and operates physical car wash locations across the United States, including in Illinois, Indiana, Arizona, and Texas.

3. Defendant offers individual car washes and car washes under a membership or subscription model.

4. Customers who visit the Defendant's physical car wash locations are regularly signed up for automatically renewing car wash memberships without their knowledge or consent. Specifically, customers that fall prey to Defendant's scheme believe they are only purchasing a single car wash but are instead enrolled in a car wash membership by Defendant.

5. Further, even for those customers who intend to enroll in a car wash membership, Defendant fails to clearly and conspicuously disclose vital details of the membership program, including that the membership will automatically renew each month.

6. By failing to clearly and conspicuously disclose these details, including failing to present the automatic renewal offer terms in a clear and conspicuous manner on its website and in-person at its car wash locations at the time members sign up, Defendant systematically violates the applicable automatic renewal and consumer protection statutes outlined above.

7. Defendant also violates these laws by failing to disclose clearly and conspicuously how to cancel the membership at the time of signup, and by failing to disclose that the price of the membership will automatically increase without the customers' consent after a trial period.

8. In addition to these failures, Defendant makes it difficult or impossible to cancel memberships on its website and in person, and Defendant fraudulently charges customers, including Plaintiffs, after they affirmatively cancel their memberships with Defendant.

9. As described further below, Defendant's website utilizes dark patterns and deception to prevent customers from cancelling their memberships. Further, customers who utilize Defendant's website to send a cancellation request continue to be billed even after cancelling their memberships.

10. Defendant is engaged in a pattern and practice of exploiting its members by continuing to charge them monthly fees, without the members' consent, after they have canceled their memberships.

11. Defendant's practices violate IACRA, multiple consumer protection statutes, and unjustly enrich Defendant.

12. Plaintiffs assert this action individually and on behalf of all others similarly situated, seeking monetary damages, restitution, declaratory and injunctive relief, and attorneys' fees and costs.

## PARTIES

13. Plaintiff Connors is a citizen of Illinois and a resident of St. Clair County.

14. Plaintiff Dean is a citizen of Illinois and a resident of McLean County.

15. Plaintiff Millsaps is a citizen of Indiana and a resident of Lake County.

16. Plaintiff Bellani is a citizen of Texas and a resident of Collins County.

17. Defendant is a Delaware limited liability company that owns and operates car washes throughout Illinois, Indiana, Texas, and Arizona. Defendant's headquarters is in Scottsdale, Arizona. Defendant's member is Alimentation Couche-Tard, Inc., whose United States headquarters is in Arizona. Defendant conducts business in Arizona and other states including Illinois, Indiana, and Texas. Defendant operates its car washes under two separate brands—Rainstorm and Clean Freak. The Rainstorm Car Washes are located in Illinois and Indiana, and the Clean Freak Car Washes are located in Texas and Arizona.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), as modified by the Class Action Fairness Act of 2005, because at least one member of the Classes, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Classes, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

19. The Court may assert personal jurisdiction over Defendant, because Defendant is headquartered in this District and its member resides in this District. Further, the Court has personal jurisdiction over Defendant because Defendant is doing business within this District and transacts business within this District such that it has sufficient minimum contacts with Arizona and/or has purposely availed itself of Arizona markets to make it reasonable for this Court to exercise jurisdiction over Defendant.

20. Venue is proper in this District under 28 U.S.C. § 1391(b), because Defendant resides and maintains offices within this District.

## BACKGROUND FACTS

21. Under the subscription business model, retailers provide ongoing goods or services in exchange for regular payments from the customer. Automatically renewing subscription services have grown exponentially over the last few years. These subscription services now target a wide range of customers and cater to a variety of specific interests ranging from fast food subscriptions to car wash subscriptions.

22. As the subscription economy engulfs multiple sectors of the consumer economy, companies have turned to dark patterns to hook consumers and prevent them from cancelling services. In particular, companies have found that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[1] Companies have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest

1 https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers

but be too harried to take the extra step of canceling their membership[s]."[2] As these companies have realized, "[t]he real money is in the inertia."[3] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[4]

23. Thus, to facilitate consumer inertia, a number of subscription companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with the design and flow of their websites and apps, *e.g.*, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic renewal policy programs.[5]

24. In fact, the problem has become so prevalent that the FTC recently introduced the Negative Option Rule or "Click-to-Cancel Rule" in order to protect consumers from these deceptive practices.[6]

25. In recent years, there has been an explosion in the number of car washes opened in the U.S.[7] This explosion has been fueled by the innovation of subscription car wash models—car washes that provide unlimited washes for a monthly fee.[8]

26. Lured by a new lucrative subscription model, private equity firms poured money into the car wash industry.[9]

---

[2] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html

[3] *Id.*

[4] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

[5] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[6] Federal Trade Commission, "Negative Option Rule", 16 CFR Part 425 (Oct. 16, 2024), https://www.ftc.gov/ system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf

[7] Patrick Sisson, *Why Are There Suddenly So Many Car Washes?*, BLOOMBERG (Feb. 21, 2024 at 8:00 AM EST), https://www.bloomberg.com/news/features/2024-02-21/car-washes-are-taking-over-the-us-here-s-why.

[8] *Id.*

[9] *Id*; Obey Matin Manayiti, *Workin' at the car wash: PE firms race to consolidate the sector*, PE HUB (May 26, 2022), https://www.pehub.com/workin-at-the-car-wash-pe-firms-race-to-consolidate-the-sector/.

27. In 2022, Defendant was purchased by Alimentation Couche-Tard, Inc., a Canadian multinational corporation. Couche-Tard owns and operates the Circle-K brand and gas stations.[10] Since this purchase, Defendant has prominently featured the "Circle-K" logo on its websites and branding.

28. At the time of purchase by Couche-Tard, Defendant had more than 170,000 fast-pass subscriber members.[11]

29. Defendant owns and operates over 70 car wash locations across four states—Illinois, Indiana, Texas, and Arizona.

30. Defendant operates these car washes under two separate brands—Rainstorm Car Wash and Clean Freak Car Wash:[12]




31. The car wash locations in Illinois and Indiana operate under the name Rainstorm Car Wash. The car wash locations in Texas and Arizona operate under the name Clean Freak Car Wash.

32. Defendant's practices and procedures, as well as signup and cancellation processes, are the same or similar across all of its locations.

---

[10] https://www.prnewswire.com/news-releases/alimentation-couche-tard-enters-into-a-definitive-agreement-to-acquire-all-of-the-membership-interests-of-true-blue-car-wash-llc-301708902.html.
[11] *Id.*
[12] https://truebluecw.com/.

33. As outlined below, Defendant has successfully implemented various dark-pattern tactics to induce more customers into signing up for automatically recurring car wash memberships, to keep those customers subscribed for as long as possible, to frustrate the cancellation process, and to ultimately bilk money from its customers through unfair and deceptive practices.

## I. DEFENDANT'S MEMBERSHIP SIGNUP PROCESS

### a. Defendant's Online Membership Enrollment Process Violates Automatic Renewal Laws and Misleads Reasonable Consumers

34. Customers can purchase a single car wash or car wash membership from Defendant online at the Rainstorm website (https://rainstormcarwash.com/) or the Clean Freak website (https://cleanfreakcarwash.com/), or purchase a car wash or membership at one of Defendant's approximately 70 car wash locations.

35. If a customer chooses to purchase a membership on one of Defendant's websites, they are presented with the following screens:

**[Image on Next Page]**

***Rainstorm Car Wash***






***<u>Clean Freak Car Wash</u>***






36. As shown above, Defendant fails to clearly and conspicuously disclose on its websites that its membership will automatically renew each month until it is cancelled. Nor does Defendant clearly and conspicuously disclose how to cancel its membership at the time of checkout. Put simply, Defendant's websites are void of these required disclosures.

**b. Defendant's Process for Enrolling Customers in Memberships at Their Physical Car Wash Locations Violates Automatic Renewal Laws and Misleads Reasonable Consumers**

37. As noted above, another way for consumers to purchase car wash services is in person at Defendant's brick-and-mortar car wash locations. Upon information and belief, Defendant's employees are trained and instructed to take consumers' payment information and place an order for them. Through this purchase method, Defendant systematically enrolls customers in car wash memberships without providing required disclosures under applicable automatic renewal laws and related state consumer protection statutes.

38. When customers, like Plaintiffs, are enrolled by Defendant's employees, the disclosures are more deficient than online, and even non-existent. This is because Defendant intentionally neglects to train employees to comply with IACRA and make the required disclosures when they sign up customers for a membership. Instead, upon information and belief, Defendant intentionally trains employees to sign up as many customers for memberships as possible. As a result, Defendant fails to provide clear and conspicuous disclosures that its memberships will automatically renew at its physical locations. Nor does Defendant clearly and conspicuously disclose to customers at its physical locations how they can cancel their memberships.

39. Additionally, Defendant's employees, also fail to disclose that memberships will automatically renew unless the customer cancels. Further, Defendant's employees also omit that the price of the membership will automatically increase after an initial promotional period, and fail to disclose the amount of the increase.

40. Upon information and belief, Defendant's employees are trained, through standard company-wide policies and procedures, to omit any information regarding the automatic renewal nature of the membership or any information about how to cancel the

membership. In short, employees are trained to ***omit*** the terms of its memberships and cancellation policy in order to sign up and retain as many customers for the automatically renewing membership as possible, all in violation of IACRA.

## II. DEFENDANT'S CANCELLATION POLICY AND RELATED MATERIAL MISREPRESENTATIONS AND OMISSIONS

41. As described above, Defendant does not provide a clear and conspicuous disclosure of its cancellation policy or how to cancel its memberships..

42. Thus, customers who sign up for a membership or who find themselves being charged a monthly membership fee without their authorization are left to try to figure out how to cancel the membership on their own.

43. Defendant also makes it prohibitively difficult to cancel a membership on its websites. There are no instructions on Defendant's websites that describe how to cancel a membership. If customers attempt to cancel a membership on Defendant's websites, they would be presented with the following screen:




44. Because there is no option to "cancel," displayed on the websites, customers must determine on their own to click on the "Manage My Membership" button in order to be taken to the next step of the process. Once a customer selects "Manage My Membership", they are shown the following screen:

[Image on Next Page].




45. There is no disclosure on this screen directing or instructing customers on how to cancel a membership. Here, the customer must select from the dropdown list under "I want to" and find the "Cancel Membership" option:



46. The “Cancel Membership” request is completely hidden from the plain view of customers on Defendant’s websites, and is designed with an intent to frustrate or prevent customers from cancelling their memberships.

47. Even after selecting the “Cancel Membership” option, customers must then fill out the information form pictured above, even if they do not know what information was provided to Defendant during the sign-up process, if any. If a customer does not have the information for the email address, phone number, or barcode, or if Defendant has not collected any of this information, then the customer will not be able to send a cancellation request.

48. The above-pictured multi-step process for cancellation is a classic dark pattern intended to confuse and mislead customers and prevent them from cancelling their memberships.

49. Even if a customer is able to complete and submit a request for cancellation on Defendant’s websites, their membership is not immediately cancelled. Instead, Defendant is merely sent a cancellation request and customers are informed their ticket has been received by Defendant.

50. As further described below, publicly available information demonstrates that numerous customers of Defendant—including the named Plaintiffs in this case—have submitted the cancellation requests and continued to be charged by Defendant.

51. Dismayed by the difficulty or impossibility of cancelling online, many customers will call or visit the physical car wash location to request to cancel their membership. However, even here Defendant regularly refuses to cancel the membership (instructing customers to cancel online) and/or accepts the customer’s request but continues to charge the customer anyway.

52. Upon information and belief, Defendant engages in a systematic practice of refusing to cancel memberships when customers formally request cancellation and charging members after they have requested their memberships be cancelled.

53. Customers who have signed up in-person or online are given no disclosure or instruction on how to cancel their memberships. As a result, customers have no way of knowing how to cancel their automatically renewing memberships.

54. The IACRA specifically states that Defendants who make an automatic renewal offer to customers must provide a "cost-effective, timely, and easy-to-use mechanism for cancellation." 815 ILCS 610/10(b-5). Defendant's difficult and deceptive cancellation practice violates the IACRA.

55. The FTC warned against similar dark patterns in its September 2022 Report entitled *Bringing Dark Patterns to Light*. In the report, the FTC gave an example of a deceptive dark pattern utilized by a company where customers could not cancel a subscription even after repeated attempts at calling, emailing, and contacting the company through customer support forms. The company instead "rejected any cancellation attempt through one of these methods and instead required consumers to navigate a difficult-to-find, lengthy, and confusing cancellation path on the website."[13]

56. The FTC also recently passed their Negative Option Rule or "Click-To-Cancel Rule," which "requires sellers to provide consumers with simple cancellation mechanisms to immediately halt all recurring charges," in addition to requiring sellers to clearly disclose automatically renewing memberships and obtain affirmative consent before enrolling consumers in automatically renewing subscriptions or memberships.[14]

57. Defendant's membership and cancellation process is the kind of scheme the FTC is targeting with its new rule. Simply put, Defendant does not disclose to customers who sign up for memberships how they can cancel the membership. Defendant also directs customers who wish to cancel—if they direct them at all—to use a website that the customer may have never interacted with before in order to cancel their membership.

---

[13] Federal Trade Commission, *Bringing Dark Patterns to Light*, Staff Report at pp. 12-13 (September 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf.

[14] Federal Trade Commission, "Negative Option Rule", 16 CFR Part 425 (Oct. 16, 2024), https://www.ftc.gov/ system/files/ftc_gov/pdf/p064202_negative_option_rule.pdf.

58. Defendant's deceptive and confusing website design prevents customers from easily cancelling their memberships. In addition, customers who request cancellations in person or online are regularly charged on an ongoing basis in accordance with Defendant's standard practices of charging consumers regardless of cancellation requests.

## III. DEFENDANT'S PROMOTIONAL DISCOUNT SCHEME

59. Defendant regularly offers its memberships at discounted prices in order to incentivize customers to sign up.

60. However, Defendant does not disclose to customers who sign up in-person that the price quoted to customers is a "discount" price that will increase substantially after a brief discount period of one or two months.

61. Defendant fails to disclose that the price of the membership will increase—normally to the most expensive membership option—after a promotional period.

62. Defendant similarly fails to disclose what the new price of the membership will be.

63. On information and belief, it is part of Defendant's systematic training, policy, and procedures for employees to omit any information about the promotional period or the details of any future price increase.

64. Defendant's misrepresentations and omissions related to its promotional discounts are deceptive and mislead reasonable consumers.

65. Defendant's failure to train their employees to disclose at the time of signup that memberships will automatically increase in price at a later date violates IACRA and the consumer protection statutes described in this Complaint.

## IV. CONSUMERS REGULARLY COMPLAIN ABOUT DEFENDANT'S DECEPTIVE RECURRING CHARGES, AUTOMATIC RENEWAL SCHEME, DIFFICULTY CANCELLING, AND BILLING PRACTICES

66. Defendant is well aware that its car wash membership scheme deceives consumers. Rainstorm and Clean Freak customers have complained of Defendant's deceptive billing practices on websites like the Better Business Bureau ("BBB"), where both brands have an "F" rating from customers.

67. Below is a sampling of the customer complaints on BBB associated with the memberships at Rainstorm Car Wash and Clean Freak Car Wash:

**Rainstorm**

**Initial Complaint**
12/18/2023

**Complaint Type:** Billing Issues
**Status:** Answered

Cancelled my membership 3 times. Still getting charged each month even though I've called them 5 times and they ask for my name and number and say a manger will get back to me but never does.

**Initial Complaint**
06/16/2023

**Complaint Type:** Service or Repair Issues
**Status:** Unanswered

I visited the Rainstorm Car Wash on 107th and ********* in ************* in March of 2023. I have a 20 year old car and went in for a single car wash for $10 that day. My card did not go through in the self-service device and a manager/salesman quickly walked over to me and said he was the manager and asked me if I wanted a continuing monthly car wash for $22 a month. I told him no, I just wanted a single car wash for $10. He said give me your card and I will put the car wash through for you because it was not reading my card. He then did the transaction came around by my window and put something on the windshield and I asked him what he was doing. He said this is a sticker so you can come back for another car wash within a week. I thought it was odd but it was a new owner of this car wash with now the Rainstorm name. I am a senior and have very high medical bills and cannot afford any extra money being taken out of my account and have contacted the company but not heard back. They have now been charging my account for 4 months $22 a month for a total of $88 for a single $10 car wash. I am trying to stop this but they are not cooperating as they have no customer service! I have been trying to discontinue this and get a full refund but have been unable to because they're not returning my calls. I know the federal government has passed laws to stop this recently but I need assistance. I would never go to this car wash again or recommend it to anyone! They are literally stealing my money which I never approved them to do under false pretenses? Perhaps we should get a class action suit going with all the other people that I'm sure they're stealing money from! We need more independent businesses not more conglomerated companies that don't care about their customers. The prior owner of the car wash provided a good service which I used for years. I need my money back I cannot afford this. I need this constant tapping of my bank account to stop! Very ****** off!

**Initial Complaint**
04/20/2023

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

This car wash business offers a "Fast Pass" a monthly fee providing use of the car wash any time during that month. I had a Fast Pass for a long time and had no problems it was $22.00 per month. I no longer frequent East Dundee and hadn't used the pass for a couple of months. I used it in November, 2022. They have the exact date. After going through the car wash I stopped in to the office and cancelled my Fast Pass and he took care of it right then and there at the computer. I have been charged for 3 more months, automatically deducted from my credit card. I called the manager and explained that I had cancelled it and wanted my money back for December. Nothing happened, I was then subsequently charged again in January and February, 2023. I called the manager and told him this is continuing to happen and I was pretty upset. A District Manager called me and told me he'd resolve the issue and refund me the $66.00 I haven't received any refund yet and now it's been about a month since the phone call.

**Initial Complaint**
11/22/2022

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

This company has been charging me for four months after I canceled. The number on the site is not active. This is theft and I want my money back.

## <u>Clean Freak</u>

**Initial Complaint**
10/07/2024

**Complaint Type:** Product Issues
**Status:** Unanswered ?

It is very difficult , if not impossible, to cancel a membership. I canceled several months ago and continue to be charged. There is no customer service support number available for clean freak. The only way to contact them is through their website. Even the local clean freak manager said theres no way to contact them directly for cancellation. They ignore the requests for cancellation on their website and continue to charge. They do not send any confirmation of the cancellation, and you need to take a screenshot of their webpage in order to provide documentation to your bank. This has not yet been resolved.

**Initial Complaint**
09/09/2024

**Complaint Type:** Customer Service Issues
**Status:** Unanswered ?

I believe this business intentionally ignores requests to cancel subscriptions.I filled out their online form to cancel my subscription in July of 2024 and the next page isnt a confirmation of cancellation but rather a page that states that the ticket has been received. They also do not send a confirmation email. I then have been charged for two more months totaling 60$. I have tried to reach out through their phone number but its automated system redirects you to fill out the useless online forms. Trying to speak to with a customer service representative leads to the automated system telling you that the inbox is full and then not responding anymore. I am unable to dispute with my bank since they dont provide receipts or emails.

**Initial Complaint**
07/16/2024

**Complaint Type:** Customer Service Issues
**Status:** Unanswered ?

I have been trying to cancel For see year monthly subscription or service month after month I get pulled out $25. Ive emailed them. *** left them voicemail. Sometimes the voicemail is full. I have gone over there to try to speak to a manager. I left my telephone number with employees because the manager is not available, I have tried to do anything and everything I can and I just got another $25 pulled out of my account yesterday so I would like my account to be canceled as well as refunded

**Initial Complaint**
01/25/2024

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

I canceled my membership a year ago. Come to find out ive been charged 20 bucks a month regardless. Tried to cancel again and the sight they send me to won't let me. And nobody to talk to. I tried calling the business no help.

**Initial Complaint**
07/05/2024

**Complaint Type:** Product Issues
**Status:** Unanswered ?

In September 2019 Clean Freak Car Wash (*******************) began charging my business credit card monthly for unlimited car washes. I never signed up for this and never authorized Clean Freak to charge my credit card. The charges were to my business account which is monitored by a bookkeeper. I almost never look at it. In April or May of this year I was reviewing the statement for another charge, noticed the monthly charge and subsequently reviewed prior statements. I found that from 9/19 through 5/22 my card was charged $26 per month and from 5/22 through 5/24 my card was charged $30 per month. The total charged to the account without authorization was $1,578.00. From April through June I attempted to call, email, fill out website forms. The only response was a return phone call from a manager that was no longer with the company and provided me with the name and phone number of the appropriate person to contact. Called him three times without a return call. On 6/18 24 I left a detailed message on Clean Freak's Support Line. Finally they responded advising that they had referred the matter to the manager of the store in question. On 7/5/24 they responded advising me they would not refund my money and as far as they were concerned the matter was closed.Clean Freak charged my credit card without authorization and have consequently stolen $1,578.00. Actually it may only be $1,548.00 since they gave me a $13.00 refund on my card. I have asked them for copies of any document they have that supports their claim that I signed up for their service but so far they have produced nothing.

**Initial Complaint**
06/17/2024

**Complaint Type:** Product Issues
**Status:** Unanswered ?

Voicemail is full, unable to leave a message phone number listed on the BBB website for CleanFREAK CARWASH. UNABLE 2 CANCEL MY CARWASH. UNABLE TO GET ANYONE YO CANCEL OVER THE ***** OR ASSIST ME UNDER THE **** YOU have an F rating on the BBBs website for failure to respond to complaints, if the carwash is not canceled I will dispute (charge back). Store refuses to cancel. Unhappy with the quality of the wash and customer service. Why is the voicemail full? Why doesn't anymore clear the messages? What is there an F. rating on the BBBs website? Why can't I cancel online? Why can't the store cancel? Why can't I reach customer service or corporate office. Why wasn't additional accommodations provided to me under the ***** WHY is it so difficult to cancel the membership? I don't want a refund I would like answers to my questions and asst. I can be reached at ************. PLEASE DO NOT HAVE THE STORE MGR CALL ME. PLEASE DO NOT CHARGE MY CARD ANYMORE.

**Initial Complaint**
01/11/2024

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

I canceled my membership with Clean Freak Car Wash in late October or early November of 2023 and advised them to stop charging my credit card immediately They acknowledged my cancellation with an email stating that no other charges would be made to my credit card beginning the following month but they have continued to charge my card .

**Initial Complaint**
12/23/2023

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

I have tried to cancel the membership multiple times and they keep running my card, I just paid them less than 2 weeks ago and they are charging me again, this is my 5th request stop billing me and cancel all services

**Initial Complaint**
10/17/2023

**Complaint Type:** Billing Issues
**Status:** Unanswered ?

Purchased a membership in June, cancelled in July. Continue to receive automated charges to my credit card (five occasions so far). Cancelled on their website, multiple times, called and cancelled. Can no longer reach them by phone, as their system goes nowhere.I dispute the charges every month through my credit card and the money is returned. However this is a systemic issue - my recourse is to file a dispute with each charge or cancel my credit card. My clean freak member number was 30633+668176 (the seven in this number was rubbed out and it is my best guess). Thanks

**Initial Complaint**
10/10/2023

**Complaint Type:** Product Issues
**Status:** Unanswered ?

I have contacted Cleanfreak carwash multiple times to cancel my membership with zero response from their company. The cancelation requests were submitted electronically, in person, and over the phone. I have been told that I would be called back to verify my cancellation request success, and have yet to receive any notice. This carwash is always broken down or closed for various reasons, and the staff are rude and unapologetic for the never-ending problems the *********** location has. I continue to be billed for a monthly service that I am regularly unable to utilize, and I need the membership to be cancelled immediately, with proper refunds for services that were never rendered by this company!

**Initial Complaint**
05/08/2023

**Complaint Type:** Sales and Advertising Issues
**Status:** Unanswered ?

Clean Freak acquired my local car wash a year or so ago and promptly raised the rates of my monthly subscription. I went the location and asked about canceling it, they said Id have to call corporate. I called the number and only got an automated response. I went to the website and find a cancellation form and filled it out and discovered they apparently just go some place to die. My subscription was never cancelled because I just noticed, 6 months later they are still charging **** just had to cancel my card and order a new one in hopes that will work.

68. These reviews are merely a sampling of the negative comments consumers have left about Defendant's deceptive sign-up, billing, and cancellation policies and

practices. As reflected in this sampling of complaints and the experience of Plaintiffs described below, Defendant's conduct is uniform and widespread.

69. As shown above, customers regularly encounter the same problems as Plaintiffs. Defendant fails to disclose the automatic renewal terms, regularly denies that customers have an account in person, and the websites make it difficult or impossible for customers to cancel their memberships.

## V. PLAINTIFFS' EXPERIENCES

### a. Monte Connors

70. On or around July 3, 2023, Plaintiff Connors visited the Rainstorm Car Wash located at 5600 N Belt W, Bellville, Illinois 62226.

71. At that time, Plaintiff Connors was assisted by an employee of Rainstorm Car Wash, who took Plaintiff Connors' debit card and signed him up for the membership. Plaintiff did not interact with any kiosk or receive any disclosures regarding auto-renewal or cancellation. Defendant's employee only told Plaintiff Connors that this was a membership for $9.99. In accordance with Defendant's policies and training, Defendant's employee did not clearly and conspicuously disclose that Plaintiff Connors' membership would automatically renew until it was cancelled, nor did the employee disclose how to cancel the membership.

72. Defendant's employee also failed to disclose that $9.99 was merely a promotional price, and that the price of the membership would increase to $40 per month after the first month of membership

73. Furthermore, according to Defendant's training and policies, Defendant's employee did not disclose clearly and conspicuously anywhere in the signup process that this membership would automatically renew, how to cancel the membership, or that the membership would increase in price and what new price would be charged.

74. If Plaintiff Connors had known the membership would automatically renew at a much higher price each month, he would not have purchased a membership.

75. Plaintiff Connors was charged $9.99 on July 3, 2023. Plaintiff's debit card was subsequently automatically charged $40 on August 3, 2023, September 3, 2023, and October 3, 2023.

76. On October 3, 2023, Plaintiff Connors sent an email to Defendant affirmatively requesting that Defendant cancel the subscription. *See* Exhibit A.

77. Defendant did not cancel the membership and continued charging Plaintiff Connors $40 a month from November 2023 to January 2024. On January 3, 2024, Plaintiff again sent an email request, demanding that his membership be cancelled, and reminding Defendant that he cancelled three months earlier. *See* Ex. B.

78. Defendant continued to automatically charge Plaintiff Connor's debit card $40 again on February 3, 2024. Plaintiff requested that Defendant cancel the membership again on February 4, 2024 via email. *See* Exhibit C. Defendant ignored this third request to cancel and charged Plaintiff Connor's debit card $40 again on March 20, 2024.

79. Plaintiff did not authorize Defendant to automatically renew his membership for $40 each month.

80. Plaintiff did not authorize Defendant to make monthly charges to his account after his cancellation.

81. Defendant nevertheless automatically renewed Plaintiff Connors' membership and charged Plaintiff an additional five (5) times after the first cancellation request.

82. Plaintiff Connors eventually had to make a stop payment request with his financial institution in order to stop the automatic charges.

83. Plaintiff Connors has not received a refund for these charges.

84. Had Plaintiff Connors known he was being enrolled in an automatic renewal service when he visited the Rainstorm Car Wash on or around July 3, 2023, he would not have purchased a membership.

85. Had Plaintiff Connors been told that his membership would increase in price when he was first signed up for a membership on or around July 3, 2023, he would not have purchased a membership.

86. If Plaintiff Connors had known that he would not be able to cancel his membership and that he would continue to be charged even after cancellation, he would not have purchased a membership.

87. Plaintiff Connors suffered real monetary loss as a result of Defendant's failure to disclose its autorenewal and cancellation policy deceptive billing practices.

**b. Dominique Dean**

88. On or around July 2023, Plaintiff Dean visited the Rainstorm Car wash located at Bloomington, Illinois.

89. Plaintiff Dean intended to purchase a single car wash from Defendant, but instead he was signed up for an automatically renewing membership.

90. At the time of sign up, Plaintiff Dean was assisted by an employee of Rainstorm Car Wash, who took Plaintiff Dean's debit card and signed him up for the membership instead of the single car wash he purchased. In accordance with Defendant's policies and training, the Defendant's employee did not clearly and conspicuously disclose that Plaintiff Dean's membership would automatically renew until it was cancelled, nor did the employee disclose how to cancel the membership.

91. In fact, Defendant actually signed Plaintiff Dean up for an automatically renewing membership without disclosing that fact to him. Plaintiff Dean believed he was only purchasing a single car wash.

92. Plaintiff Dean only gave his billing information to Defendant for a single car wash. He did not authorize an automatically renewing monthly membership.

93. However, Defendant enrolled him in an automatically renewing monthly membership without his authorization.

94. Defendant subsequently charged Plaintiff Dean's debit card for multiple monthly payments.

95. Once Plaintiff realized he was being charged automatically each month, he informed an employee at the Rainstorm Car Wash located at Bloomington, Illinois, that he wanted the membership cancelled.

96. Defendant's employee did not cancel Plaintiff Dean's membership and instead informed Plaintiff that the system was not working.

97. Plaintiff Dean continued to incur automatic monthly charges for a membership he did not want or authorize.

98. Plaintiff Dean eventually had to cancel his card in order to stop the automatic monthly charges.

99. Plaintiff Dean did not authorize Defendant to enroll him in an automatically renewing monthly membership.

100. Plaintiff Dean did not authorize Defendant to continue to charge him an automatically renewing monthly fee after he cancelled his membership.

101. If Plaintiff Dean had known that he would be enrolled in an automatically renewing monthly membership that he could not cancel, then he would not have given Defendant his payment information.

102. Plaintiff Dean has not received a refund for these charges.

103. Plaintiff Dean suffered real monetary loss as a result of Defendant's failure to disclose its autorenewal and cancellation policy deceptive billing practices.

**c. Melissa Millsaps**

104. In 2023, Plaintiff Millsaps signed up for a car wash membership at the Rainstorm Car wash located at 7141 Calumet Ave., Hammond, IN 46324.

105. At the time of signup, Plaintiff Millsaps was assisted by an employee of Rainstorm Car Wash, who took Plaintiff Millsaps's debit card and signed her up for the membership. Plaintiff Millsaps did not interact with any kiosk or receive any disclosures regarding auto-renewal or cancellation. In accordance with Defendant's policies and training, the Defendant's employee did not clearly and conspicuously disclose that Plaintiff Millsaps's membership would automatically renew until it was cancelled, nor did the employee disclose how to cancel the membership.

106. At the time of signup, Defendant did not disclose to Plaintiff at what price the membership would automatically renew after an initial promotional period.

107. Plaintiff requested information on how to cancel the membership, and Defendant's employee told Plaintiff she could cancel the membership online at the Defendant's Rainstorm website.

108. Within a month of being enrolled in the car wash membership, Plaintiff Millsaps visited Defendant's Rainstorm website to cancel her membership.

109. Plaintiff Millsaps attempted to cancel her membership on Defendant's Rainstorm website, but due to Defendant's deceptive website and confusing cancellation process, Plaintiff Millsaps was unable to cancel her membership.

110. Plaintiff Millsaps then visited the Rainstorm location in Hammond, Indiana, and instructed Defendant to cancel her membership.

111. In accordance with Defendant's training and procedures, Defendant's employee did not grant Plaintiff's cancellation request and again told Plaintiff Millsaps to cancel her membership online.

112. Plaintiff Millsaps demanded that Defendant cancel the membership in person immediately. Defendant then informed Plaintiff that her membership was cancelled.

113. However, Defendant did not cancel Plaintiff Millsap's membership, and her membership automatically renewed at a higher price than was disclosed to her, so she immediately went to Defendant's Hammond, Indiana, Rainstorm location and demanded her membership be cancelled again.

114. However, Defendant continued to automatically bill Plaintiff for at least two more months after she cancelled her membership for a second time.

115. After discovering the additional charges, Plaintiff Millsaps returned to Defendant's Hammond, Indiana Rainstorm location and demanded that Defendant cancel her membership.

116. Defendant finally cancelled Plaintiff Millsaps's membership after her third cancellation request.

117. Plaintiff Millsaps did not authorize Defendant to enroll her in an automatically renewing monthly membership at a higher price than disclosed.

118. Plaintiff Millsaps did not authorize Defendant to continue to charge her an automatically renewing monthly fee after she cancelled her membership.

119. If Plaintiff Millsaps had known that she would be enrolled in an automatically renewing monthly membership at a higher price than was disclosed, then she would not have given Defendant her payment information.

120. If Plaintiff Millsaps had known that she would not be able to cancel her membership and that she would continue to be charged even after cancellation, then she would not have given Defendant her payment information

121. Plaintiff Millsaps has not received a refund for these charges.

122. Plaintiff Millsaps suffered real monetary loss as a result of Defendant's failure to disclose its autorenewal and cancellation policy deceptive billing practices.

**d. Raja Bellani**

123. In or around August 2024, Plaintiff Bellani signed up for a month of free car washes at the Clean Freak car wash located in Collins County, Texas. In accordance with Defendant's policies and training, the Defendant's employee did not clearly and conspicuously disclose that Plaintiff Bellani's membership would automatically renew until it was cancelled, nor did the employee disclose how to cancel the membership.

124. On September 23, 2024, Plaintiff Bellani went to Defendant's Clean Freak car wash located in Collins County, Texas, and cancelled his membership.

125. On September 25, 2024, Defendant charged Plaintiff $34.99 in an automatically renewing monthly transaction.

126. Plaintiff Bellani did not authorize Defendant to automatically charge his credit card after he cancelled his membership.

127. If Plaintiff Bellani had known that he would be enrolled in an automatically renewing monthly membership that he could not cancel, then he would not have given Defendant his payment information.

128. Plaintiff subsequently cancelled his card to stop the charges.

129. Plaintiff Bellani has not received a refund for these charges from Defendant.

130. Plaintiff suffered real monetary loss as a result of Defendant's failure to disclose its autorenewal and cancellation policy deceptive billing practices.

**CLASS ACTION ALLEGATIONS**

131. *Description of the Classes*: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), individually and on behalf of the following Classes of persons:

> Illinois Sub-Class: All persons in Illinois who, within the applicable statute of limitations period, were automatically enrolled in a Rainstorm Car Wash membership and were charged at least one renewal fee by Defendant.
>
> Indiana Sub-Class: All persons in Indiana who, within the applicable statute of limitations period, were enrolled in a Rainstorm Car Wash membership where the price of the monthly membership was increased and/or where they were charged a membership fee after they cancelled the membership.
>
> Texas Sub-Class: All persons in Texas who, within the applicable statute of limitations period, were enrolled in a Clean Freak Car Wash membership where the price of the monthly membership was increased and/or where they were charged a membership fee after they cancelled the membership.

132. The Illinois, Texas, and Indiana Subclasses are collectively referred to herein as the "Classes."

133. Plaintiffs reserve the right to modify or amend the definition of the Classes as this litigation proceeds.

134. Excluded from the Classes are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

135. The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

136. This action is properly maintainable as a class action under Fed. R. Civ. P. 23, and all requirements are met for the reasons set forth in the following paragraphs.

137. Numerosity: The members of the proposed Classes are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through appropriate discovery. Plaintiffs estimate the number of members in the Classes to be in the thousands.

138. Common Questions of Law and Fact Predominate: There are many questions of law and fact common to Plaintiffs and the Classes, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

a. Whether Defendant's membership contracts constitute "automatic renewals" within the meaning of 815 ILCS 601/1;
b. Whether Defendant failed to provide the clear and conspicuous language required by 815 ILCS 601/10(a);
c. Whether Defendant was unjustly enriched;
d. Whether Defendant's conduct alleged herein constitutes unfair and deceptive trade practices;
e. Whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act;
f. Whether Defendant violated the Texas Deceptive Trade Practices Act;
g. Whether Defendant violated the Indiana Deceptive Consumer Sales Act;
h. The proper method or methods by which to measure damages; and
i. The declaratory and injunctive relief to which the Class is entitled.

139. Typicality: Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes have been similarly affected by Defendant's common course of misconduct.

140. Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so.

141. Superiority of Class Action: Plaintiffs and the members of the Classes suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Classes is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

142. Risk of Inconsistent or Varying Adjudication: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Classes would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for the Defendant as the parties opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

143. Action Generally Applicable to Classes as a Whole: Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate

final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CLAIM FOR RELIEF

**Violation of the Illinois Automatic Contract Renewal Act**

**815 ILCS 601/1, *et seq.***

***(on behalf of Plaintiffs Connors and Dean and the Illinois Sub-Class)***

144. Plaintiffs Connors and Dean incorporate the preceding paragraphs of this Complaint as if fully set forth below.

145. The IACRA, 815 ILCS 601/10(a) requires that, "[a]ny person, firm, partnership, association, or corporation that sells or offers to sell any products or services to a consumer pursuant to a contract, where such contract automatically renews unless the consumer cancels the contract, shall disclose the automatic renewal clause clearly and conspicuously in the contract, including the cancellation procedure."

146. Defendant is a person, firm, partnership, association, or corporation that sells or offers to sell products or services to consumers, such as Plaintiffs Connors and Dean and the Illinois Sub-Class, pursuant to a contract.

147. The Rainstorm Car Wash membership automatically renews unless customers, such as Plaintiffs and members of the Illinois Sub-Class, cancel the membership.

148. As described above, Defendant violated the IACRA by not disclosing the automatic renewal terms and cancellation procedure clearly and conspicuously to customers at the time customers were enrolled in the membership.

149. Upon information and belief, Defendant has not established and implemented written procedures to comply with the IACRA or enforce compliance with its procedures.

150. Upon information and belief, Defendant's failure to comply with the IACRA was not the result of error.

151. Defendant did not provide a full refund or credit for all amounts billed to or paid by consumers, such as Plaintiffs Connors and Dean and the Illinois Sub-Class.

152. A violation of the IACRA "constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act." *See* ACRA, 815 ILCS 601/15.

153. Plaintiffs Connors and Dean and members of the Illinois Sub-Class have sustained damages as a result of Defendant's conduct.

## SECOND CLAIM FOR RELIEF

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

### 815 ILCS 505/1, *et seq.*

**(*on behalf of Plaintiffs Connors and Dean and the Illinois Sub-Class*)**

154. Plaintiffs Connors and Dean incorporate by reference the preceding paragraphs as if fully set forth herein.

155. Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.

156. Section 2 of the ICFA, 815 ILCS 505/2, provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

157. Section 10a of the ICFA, provides in relevant part:

> (a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .
>
> . . .

> (c) . . . [I]n any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

815 ILCS 505/10A(a).

158. Plaintiffs Connors and Dean and members of the Illinois Sub-Class are "consumers" or "persons," as defined under the ICFA, 815 ILCS 505/1 *et seq*.

159. Defendant's conduct, as alleged herein, occurred in the course of trade and commerce.

160. Defendant knowingly and intentionally committed deceptive acts, including, but not limited to:

a. Misrepresenting the terms and cancellation policy of its memberships;
b. Enrolling customers in automatically renewing memberships without their affirmative consent;
c. Failing to disclose that the membership automatically renews each month until cancelled;
d. Misrepresenting the true cost of its car wash memberships;
e. Failing to disclose that the price of its membership will increase after a promotional period and failing to disclose what the new price of the membership will be;
f. Utilizing a deceptive scheme to prevent customers from cancelling memberships on its website;
g. Failing to allow customers to cancel their memberships online or in person;
h. Making it unreasonably difficult for customers to cancel their membership; and
i. Charging customers membership fees after they affirmatively cancelled their membership.

161. Defendant systematically failed to adequately train employees to comply with cancellation procedures required under Illinois law and failed to provide a proper policy and procedure related to the cancellation of Rainstorm Car Wash memberships.

162. Defendant's misrepresentations and omissions to Plaintiffs and the Illinois Sub-Class were material and were likely to mislead Plaintiffs and members of the Illinois Sub-Class, and, in fact, did mislead Plaintiffs and Illinois Class members.

163. Defendant continued to charge Plaintiffs Connors and Dean monthly membership fees after Plaintiffs cancelled their memberships.

164. Defendant enrolled Plaintiff Dean in an automatically renewing membership even though Plaintiff Dean only provided his payment information in order for the purchase of a single car wash.

165. Plaintiffs relied on Defendant's misrepresentations and omissions as discussed above. Defendant's misrepresentations and omissions were a substantial factor in Plaintiffs' purchase decisions. If Plaintiffs had known about the automatic renewal scheme and cancellation scheme, they would not have provided Defendant their payment information.

166. In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to purchase a car wash or car wash membership.

167. Defendant made these statements and omissions with the intent that Plaintiffs and Illinois Sub-Class members would rely on them.

168. Defendant's conduct described herein constitutes unfair and deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

169. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Illinois Sub-Class have suffered actual damages.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Violation of the Indiana Deceptive Consumer Sales Act**

**Ind. Code § 24-5-0.5-1, *et seq.***

**(*on behalf of Plaintiff Millsaps and the Indiana Sub-Class*)**

170. Plaintiff Millsaps incorporates by reference the preceding paragraphs as if fully set forth herein.

171. The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

a. Simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;
b. Protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and
c. Encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

172. The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

173. Defendant is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

174. This matter involves a "consumer transaction," defined as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things." Ind. Code § 24-5-0.5-2(a).

175. The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act,

omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

176. The DCSA further provides:

> Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:
>
> a. That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.
>
> b. That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not. . . .

Ind. Code § 24-5-0.5-3(b).

177. Defendant committed deceptive acts, including, but not limited to:

a. Misrepresenting the terms and cancellation policy of its memberships;

b. Misrepresenting the true cost of its car wash memberships;

c. Failing to disclose that the price of its membership will increase after a promotional period and failing to disclose what the new price of the membership will be;

d. Utilizing a deceptive scheme to prevent customers from cancelling memberships on its website;

e. Failing to allow customers to cancel their memberships online or in person;

f. Making it unreasonably difficult for customers to cancel their membership; and

g. Charging customers membership fees after they affirmatively cancelled their membership.

178. Defendant's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.

179. The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

180. The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

181. Had Plaintiff Millsaps been aware of Defendant's deceptive billing and cancellation practices, Plaintiff Millsaps would not have entered into such a relationship with Defendant and would not have paid the membership fees.

182. In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to purchase a car wash or car wash membership

183. As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DCSA, Plaintiff Millsaps and members of the Indiana Sub-Class have paid more for Defendant's service than they should have and have suffered monetary damages for which Defendant is liable.

184. Plaintiff Millsaps and members of the Indiana Sub-Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff Millsaps and members of the Indiana Sub-Class are entitled to, *inter alia,* actual damages, treble damages, attorney's fees, and injunctive relief.

## <u>FOURTH CLAIM FOR RELIEF</u>

**Violation of the Texas Deceptive Trade Practices Act**

**Tx. Bus. & Comm. Code § 17.41, *et seq.***

**(*on behalf of Plaintiff Bellani and the Texas Sub-Class*)**

185. Plaintiff Bellani realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

186. Defendant's acts and practices as further described above violate the Texas Deceptive Trade Practices Act ("DTPA"), Tx. Bus. & Comm. Code § 17.41, *et seq*.

187. The DTPA states:

> (a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:
>
> (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is:
>
> (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and
>
> (B) relied on by a consumer to the consumer's detriment;
>
> (2) breach of an express or implied warranty;
>
> (3) any unconscionable action or course of action by any person; or
>
> (4) the use or employment by any person of an act or practice in violation of Chapter 541, Insurance Code….

Tx. Bus. & Comm. Code § 17.50, *et seq*.

188. Texas lawmakers explicitly require that the DTPA be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tx. Bus. & Comm. Code § 17.44.

189. The DTPA provides additional protections to consumers who are victims of deceptive, improper, illegal or unconscionable practices.

190. Defendant's violations include, but are not limited to:

a. failing to disclose its actual membership and cancellation practices when customers purchase a car wash or membership;
b. Misrepresenting the terms and cancellation policy of its memberships;
c. Misrepresenting the true cost of its car wash memberships;
d. Failing to disclose that the price of its membership will increase after a promotional period and failing to disclose what the new price of the membership will be;
e. Utilizing a deceptive scheme to prevent customers from cancelling memberships on its website;
f. Failing to allow customers to cancel their memberships online or in person;
g. Making it unreasonably difficult for customers to cancel their membership; and
h. Charging customers membership fees after they affirmatively cancelled their membership.

191. Defendant's failure to disclose such practices induced Plaintiff Bellani into purchasing a membership, which he would not have done had such information been disclosed. Plaintiff Bellani relied on this deception to his detriment. *See* Tx. Bus. & Comm. Code § 17.50(a)(1)(B).

192. Further, Defendant charged Plaintiff Bellani a membership fee after he affirmatively cancelled his membership. This constituted a deceptive act in violation of the DTPA.

193. In addition, Defendant's course of action violates the DTPA because it is unconscionable: Defendant took advantage of the Plaintiff Bellani's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. *See* Tx. Bus. & Comm. Code §§ 17.45(5), 17.50(a)(3).

194. As a direct and proximate result of Defendant's deceptive billing practices, Plaintiff Bellani and members of the Texas Sub-Class suffered injury and/or damages, including the payment of deceptive fees, as described herein, and the loss of the benefit of their respective bargains with Defendant.

195. Further, Defendant's conduct was substantially injurious to Plaintiff Bellani and members of the Texas Sub-Class in that they were forced to pay fees they were told they would not incur.

196. Defendant's actions in engaging in the above-described unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the members of Plaintiff Bellani and the Texas Sub-Class.

197. Had Plaintiff Bellani been aware of Defendant's deceptive billing and cancellation practices, Plaintiff Bellani would not have entered into such a relationship with Defendant and would not have paid the membership fees.

198. In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to purchase a car wash or car wash membership

199. As a result of Defendant's violations of the DTPA, Plaintiff Bellani and members of the Texas Sub-Class have suffered and will continue to suffer actual damages.

200. Plaintiff Bellani and members of the Texas Sub-Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DTPA. Accordingly, Plaintiff Bellani and members of the Texas Sub-Class are entitled to three times economic and mental anguish damages for Defendant's fraudulent, misleading, deceptive, and unconscionable actions. *See* Tx. Bus. & Comm. Code § 17.50(b)(1).

201. Pursuant to Tx. Bus. & Comm. Code § 17.505(a), Plaintiff Bellani gave written notice to Defendant at least 60 days prior to filing this lawsuit.

## FIFTH CLAIM FOR RELIEF

**Unjust Enrichment**

**(*on behalf of Plaintiffs and the Classes*)**

202. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

203. Plaintiffs, individually and on behalf of the Classes, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiffs' statutory claims and applies only if the parties' contract is deemed unconscionable, null and void, or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees. Also, if claims are deemed not to be covered by the contract—for example, if Defendant has violated state and federal law, but in such a way that it does not violate the contract, then unjust enrichment will require disgorgement of all improperly assessed subscription fees.

204. By means of Defendant's wrongful conduct alleged herein, Defendant knowingly assessed fees upon Plaintiffs and the members of the Classes that are unfair, unconscionable, and oppressive.

205. Defendant has unjustly retained a benefit in the form of improper membership fees to the detriment of Plaintiffs and the members of the Classes.

206. Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

207. Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiffs and the members of the Classes and should be required to make restitution to Plaintiffs and the members of the Classes

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes respectfully request that the Court:

A. Certify this case as a class action, designating Plaintiffs as class representatives and designating the undersigned as Class Counsel;

B. Award Plaintiffs and the Classes actual, statutory, and punitive damages in an amount to be proven at trial;

C. Declare Defendant's conduct violates the statutes and common laws referenced herein;

D. Grant an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

E. Award Plaintiffs and the Classes restitution in an amount to be proven at trial;

F. Award Plaintiffs and the Classes pre- and post-judgment interest in the amount permitted by law;

G. Award Plaintiffs and the Classes attorneys' fees and costs as permitted by law;

H. Enjoin Defendant from engaging in the practices outlined herein; and

I. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

**ZIMMERMAN REED LLP**

Dated: July 2, 2025 By: */s/Ryan Ellersick*

Ryan J. Ellersick (AZ #038805)
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400
ryan.ellersick@zimmreed.com

**JENNINGS & EARLEY PLLC**
Christopher D. Jennings*
Tyler B. Ewigleben*
Winston S. Hudson*
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
Telephone: (601) 270-0197
chris@jefirm.com
tyler@jefirm.com

winston@jefirm.com
* *Pro Hac Vice* application to be submitted
*Counsel for Plaintiffs and the Proposed Classes*